IN THE SUPREME COURT OF NORTH CAROLINA

No. 294A22

Filed 22 March 2024

DAVID BEAVERS

v.

JOHN McMICAN

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 285 N.C. App. 31 (2022), reversing an order of summary judgment entered on 14 October 2020 by Judge Keith O. Gregory in Superior Court, Wake County, and remanding the case for further proceedings. Heard in the Supreme Court on 13 September 2023.

*Matheson & Associates, PLLC, by John R. Szymankiewicz and Jammie L. Wacenske, for plaintiff-appellee.*

*Batch, Poore & Williams, PC, by J. Patrick Williams, for defendant-appellant.*

EARLS, Justice.

This appeal raises a narrow legal issue of statutory interpretation involving the controversial heartbalm torts recognized in North Carolina. Plaintiff David Beavers brought civil claims for alienation of affection and criminal conversation against his ex-wife's alleged paramour, defendant John McMican. The first question before this Court is whether the holding in *Rodriguez v. Lemus*, 257 N.C. App. 493

(2018)[1], concerning which evidence is relevant to prove pre-separation conduct, is inconsistent with the enacted language and legislative intent of N.C.G.S. § 52-13, which specifies that post-separation conduct cannot give rise to liability in these circumstances. The second related issue for this Court is whether the trial court improperly granted summary judgment in favor of Mr. McMican. After reviewing the text of section 52-13 and finding it unambiguous, we hold that the Court of Appeals' opinion in *Rodriguez* is consistent with legislative intent. Accordingly, evidence of post-separation conduct may be used to corroborate pre-separation conduct, so long as the evidence of pre-separation conduct gives rise to more than mere conjecture. *Rodriguez*, 257 N.C. App. at 498. Nonetheless, because we find the evidence of pre-separation conduct in this case does not give rise to more than mere conjecture regarding the identity of Mrs. Beavers' paramour, we reverse the decision of the Court of Appeals and hold that the trial court properly granted summary judgment in favor of Mr. McMican.

## I.    Procedural History

On 13 December 2018, Mr. Beavers sued Mr. McMican on theories of alienation of affection and criminal conversation. On 14 January 2020, Mr. McMican filed a motion for summary judgment on both claims. On 17 August 2020, the trial court conducted a hearing on Mr. McMican's motion during which both parties referenced

---

[1] This Court denied discretionary review and dismissed a petition for writ of certiorari to review the Court of Appeals' opinion in *Rodriguez*. *See* 371 N.C. 447 (2018).

recent depositions of Mrs. Beavers and Mr. McMican's ex-wife, Jessica McMican; however, neither deposition was certified until 20 August 2020, three days later. On 14 October 2020, the trial court entered an order granting Mr. McMican's motion for summary judgment. Mr. Beavers timely appealed.

At the Court of Appeals, Mr. Beavers submitted a record supplement pursuant to Rule 11(c) of the Rules of Appellate Procedure containing, *inter alia*, the depositions of Mrs. Beavers and Mrs. McMican discussed by counsel during the summary judgment hearing. On 23 November 2021, the Court of Appeals entered an order remanding the matter to the trial court and inquiring which, if either, of the depositions the trial court considered in granting Mr. McMican's motion for summary judgment. *Beavers v. McMican*, 285 N.C. App. 31, 34 (2022). In response, on 24 February 2022, the trial court entered an amended order granting Mr. McMican's motion for summary judgment and confirming that it had not considered either of the depositions at the original hearing on the matter. *Id.* Accordingly, the Court of Appeals stated that neither deposition would inform its review of the trial court's order granting Mr. McMican's motion for summary judgment. *Id.* at 32, 35. We similarly do not consider any evidence not properly before the trial court when it decided Mr. McMican's motion for summary judgment.[2]

---

[2] Our decision is based on the principle that "[i]nformation adduced from counsel during oral arguments cannot be used to support a motion for summary judgment under Rule 56(c)." *Huss v. Huss*, 31 N.C. App. 463, 466 (1976). Therefore, we limit our consideration to "evidence consisting of affidavits, depositions, answers to interrogatories, admissions, documentary materials, facts which are subject to judicial notice, and any other materials

The Court of Appeals determined that Mr. Beavers presented sufficient evidence of post-separation conduct involving his former wife and defendant, and that under *Rodriguez,* such evidence is corroborative of pre-separation conduct even when the identity of a pre-separation extramarital sexual partner is unknown. *Id.* at 41. Thus, the Court of Appeals held that the trial court erred in granting Mr. McMican's motion for summary judgment. *Id.* Judge Jackson dissented, opining in relevant part that Mr. Beavers's allegations lacked evidentiary support, and thus, the trial court properly granted Mr. McMican's motion for summary judgment. *Id.* at 46, 63 (Jackson, J., dissenting). Based on Judge Jackson's dissent, Mr. McMican filed a notice of appeal with this Court on 21 September 2022, pursuant to N.C.G.S. § 7A-30(2).[3]

## II.    Background

David and Alison Beavers were married on 23 October 2004. Together they had three children. On 18 January 2016, Mr. Beavers discovered text messages on Mrs. Beavers's phone in which she had sent nude pictures of herself to a person identified only as "Bestie." Until this discovery, Mr. Beavers believed he and his wife had a loving marriage. In addition to the pictures, Mrs. Beavers and "Bestie" had exchanged messages referencing an instance of sexual intercourse that had occurred before the

---

which would be admissible in evidence at trial." *Id.,* (citing *Koontz v. City of Winston-Salem,* 280 N.C. 513 (1972); *Singleton v. Stewart,* 280 N.C. 460 (1972)).

   [3] Judge Jackson's dissent also explained his rationale for eliminating heartbalm torts, but this issue was not raised or argued by either party in this appeal.

exchange of the messages and pictures. At the time of this discovery, Mr. Beavers did not look at the phone number associated with the contact labeled "Bestie" or take any steps to determine "Bestie's" identity.

After confronting Mrs. Beavers, Mr. Beavers left the marital home to stay with his parents. When he returned several days later, he and Mrs. Beavers discussed the extramarital affair, and Mrs. Beavers admitted that she had engaged in sexual acts with the person identified as "Bestie." Nonetheless, she stated that she and "Bestie" had not engaged in sexual intercourse. Mrs. Beavers also told Mr. Beavers that her paramour was a coworker named "Dustin."

In the weeks that followed, Mr. Beavers, who was skeptical of the story Mrs. Beavers told during their first conversation, accused Mrs. Beavers of engaging in sexual intercourse with another man. In response, Mrs. Beavers ultimately admitted that she had engaged in sexual intercourse with someone from her workplace, but she did not specify if that person was "Dustin." Mr. Beavers was unable to discover Dustin's identity, and because Mrs. Beavers did not have anyone named "Dustin" in her contacts, Mr. Beavers guessed "Dustin" was a pseudonym. The Beaverses separated for the final time on 16 December 2016.

On 1 April 2017, three and a half months after she and her husband separated, and over a year after Mr. Beavers discovered the compromising text messages with "Bestie," Mrs. Beavers began openly dating her coworker, Mr. McMican. The two had known each other through work since the summer of 2011 and had attended work

events together with other coworkers. The record shows that in October 2016, the two exchanged ninety-eight text messages. There is also evidence that Mrs. Beavers and Mr. McMican interacted via Facebook. After learning that Mrs. Beavers and Mr. McMican were dating, Mr. Beavers concluded that Mr. McMican was his then-estranged wife's alleged paramour. But while Mr. McMican admitted to becoming romantically and sexually involved with Mrs. Beavers in April 2017, there is no evidence the two were romantically involved before that time.

### III. Standard of Review

We apply de novo review to both issues in this case. Issues of statutory interpretation are legal issues subject to de novo review. *E.g., Saunders v. ADP TotalSource Fi Xi, Inc.*, 372 N.C. 29, 38 (2019). Moreover, "[t]his Court reviews decisions arising from trial court orders granting or denying motions for summary judgment using a de novo standard of review." *Cummings v. Carroll*, 379 N.C. 347, 358 (2021). Rule 56(c) of the North Carolina Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56 (2021). When evaluating a trial court's decision to "grant or deny a summary judgment motion in a particular case, 'we view the pleadings and all other evidence in the record in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor.'"

*Cummings*, 379 N.C. at 358 (quoting *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182 (2011)).

To prevail on summary judgment, the moving party must meet "the burden (1) of proving an essential element of the opposing party's claim is nonexistent, or (2) of showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim." *Lowe v. Bradford*, 305 N.C. 366, 369 (1982) (first citing *Moore v. Fieldcrest Mills, Inc.*, 296 N.C. 467 (1979); and then citing *Zimmerman v. Hogg & Allen*, *P.A.*, 286 N.C. 24 (1974)). "If the moving party meets this burden, the non-moving party must in turn either show that a genuine issue of material fact exists for trial or must provide an excuse for not doing so." *Id.* (first citing *Econo-Travel Motor Hotel Corp. v. Taylor*, 301 N.C. 200 (1980); then citing *Moore*, 296 N.C. at 470; and then citing *Zimmerman*, 286 N.C. at 29).

## IV.    N.C.G.S. § 52-13 and the Court of Appeals' Decision in *Rodriguez v. Lemus*

Our Court and the Court of Appeals previously have held that sexual conduct which occurs after a married couple separates but before the couple divorces, can be used to support alienation of affection and criminal conversation claims. *See McCutchen v. McCutchen*, 360 N.C. 280, 284 (2006); *Jones v. Skelley*, 195 N.C. App. 500, 511–12 (2009).[4] But in 2009 the General Assembly enacted N.C.G.S. § 52-13,

---

[4] Both of these decisions were superseded by statute N.C.G.S. § 52-13(a), as enacted by An Act to Clarify Procedures in Civil Actions for Alienation of Affection and Criminal Conversation, S.L. 2009-400, § 1, 2009 N.C. Sess. Laws 780, 780, *as recognized in Rodriguez*, 257 N.C. App. 493.

which supersedes these decisions. This statute applies to both alienation of affection and criminal conversation claims and states:

> No act of the defendant shall give rise to a cause of action for alienation of affection or criminal conversation that occurs after the plaintiff and the plaintiff's spouse physically separate with the intent of either the plaintiff or plaintiff's spouse that the physical separation remain permanent.

N.C.G.S. § 52-13(a) (2021). In other words, a defendant may be liable only for conduct that occurs during the marriage and before physical separation. *Id.*; *see also Rodriguez*, 257 N.C. App. at 496–97.

The Court of Appeals interpreted subsection 52-13(a) in *Rodriguez v. Lemus,* and determined that, based on the language of the statute, alienation of affection and criminal conversation claims could not be sustained without evidence of pre-separation conduct that met the elements of each respective claim. 257 N.C. App. at 496–97. There the court also determined that evidence of post-separation conduct could be used to corroborate evidence of pre-separation conduct in either an alienation of affection or criminal conversation claim, as long as the evidence of pre-separation conduct was "sufficient to give rise to more than mere conjecture." *Id*. at 498.

Defendant argues that *Rodriguez'*s holding is inconsistent with the legislative intent behind N.C.G.S. § 52-13. While it is true that the "principal goal of statutory construction is to accomplish the legislative intent," the General Assembly's intent "may be found first from the plain language of the statute." *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664 (2001). "It is well settled that, '[w]here the language of a statute is clear

and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning.'" *In re Est. of Lunsford*, 359 N.C. 382, 391–392 (2005) (alteration in original) (quoting *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209 (1990)).

Because the text of N.C.G.S. § 52-13 is unambiguous, there is no need for this Court to engage in statutory construction. Moreover, the Court of Appeals' holding in *Rodriguez* is consistent with our appellate precedent. In *In re Estate of Trogdon*, 330 N.C. 143 (1991), this Court in addressing an intestate succession claim and being tasked with determining how much evidence was necessary to show that sexual intercourse had occurred between the spouse and someone other than her now deceased husband, explained that "adultery is nearly always proved by circumstantial evidence . . . as misconduct of this sort is usually clandestine and secret." *Id.* at 148 (cleaned up). In that case the circumstantial evidence consisted of the spouse voluntarily moving from the marital home and then living with the suspected paramour, as well as the spouse's refusal to testify regarding the nature of her relationship with that person. *Id.* at 151.

Additionally, in *Pharr v. Beck*, 147 N.C. App. 268 (2001), *overruled by McCutchen*, 360 N.C. 280,[5] the Court of Appeals concluded that post-separation conduct, namely, sexual intercourse between the defendant and the plaintiff's spouse,

---

[5] *McCutchen* overruled *Pharr* "to the extent it requires an alienation of affection[] claim to be based on pre-separation conduct alone." 360 N.C. at 285.

could be used to corroborate the existence of a romantic pre-separation relationship between those parties. *Id.* at 274. Accordingly, the Court of Appeals' holding in *Rodriguez* is consistent with both the text of N.C.G.S. § 52-13(a), which requires that alienation of affection and criminal conversation claims arise from pre-separation conduct and our appellate precedent, which not only acknowledges the frequent need for circumstantial evidence to prove these types of claims but also expressly allows for evidence of post-separation conduct to corroborate pre-separation conduct. Essentially,

> N.C.G.S. § 52-13 prevents defendants in cases involving criminal conversation and alienation of affection from being held liable for acts taking place after two spouses have separated, and *Rodriguez* effectuates that policy by ensuring that, if a factfinder considers evidence of post-separation conduct, it does so only insofar as it contextualizes pre-separation conduct.

*Beavers*, 285 N.C. App. at 39. Thus, we hold that the Court of Appeals' opinion in *Rodriguez* is consistent with N.C.G.S. § 52-13's legislative intent, and evidence of post-separation conduct can be used to corroborate evidence of pre-separation conduct in alienation of affection and criminal conversation claims, if the pre-separation conduct gives rise to more than mere conjecture.

## V.    Mr. Beavers's Alienation of Affection and Criminal Conversation Claims

To establish an alienation of affection claim, a plaintiff must prove: (1) that the plaintiff and his or her spouse "were happily married, and that a genuine love and affection existed between them; (2) that the love and affection so existing was

alienated and destroyed; and (3) that the wrongful and malicious acts of the defendant produced and brought about the loss and alienation of such love and affection." *McCutchen*, 360 N.C. at 283 (cleaned up). "A malicious act 'has been loosely defined to include any intentional conduct that would probably affect the marital relationship.' " *Rodriguez*, 257 N.C. App. at 495 (quoting *Pharr*, 147 N.C. App. at 272). In cases in which the defendant has engaged in sexual intercourse with the plaintiff's spouse, "[m]alice is conclusively presumed." *Id.* at 495–96. To establish a claim for criminal conversation, a plaintiff must prove two elements: first, the plaintiff must show marriage between the spouses, and second, sexual intercourse between the defendant and the plaintiff's spouse during the marriage. *Id.* at 495 (citing *Coachman v. Gould*, 122 N.C. App. 443, 446 (1996)).

Moreover, "while a measure of certainty is required for guidance in deciding future cases," our Court has recognized that there is no "brightline test for determining how much evidence is necessary to permit a jury or trial judge to infer adultery." *In re Est. of Trogdon*, 330 N.C. at 145. Instead, "each . . . case[ ] will demand a fact-specific inquiry." *Id.* Furthermore, "[a]dultery is nearly always proved by circumstantial evidence" because such evidence "is often the only kind of evidence available." *Id.* at 148 (cleaned up). Accordingly, "adultery is presumed if the following can be shown: (1) the adulterous disposition, or inclination, of the parties; and (2) the opportunity created to satisfy their mutual adulterous inclinations." *Id.*

Importantly, and as noted above, if evidence of post-separation conduct is used

to corroborate pre-separation conduct, the evidence of pre-separation conduct must "give rise to more than mere conjecture." *Rodriguez*, 257 N.C. App. at 498. Determining what constitutes more than "mere conjecture" is particularly important "[g]iven the highly emotional nature of the subject matter" in these types of cases. *Chappell v. Redding*, 67 N.C. App. 397, 401 (1984) (quoting *Horney v. Horney*, 56 N.C. App. 725, 727 (1982)). Thus, a "definite line must be drawn between permissible inference and mere conjecture." *Id.* (quoting *Horney*, 56 N.C. App. at 727).

In *In re Estate of Trogdon*, our Court addressed the issue of mere conjecture in the context of proving adultery. While this case did not involve an alienation of affection or criminal conversation claim, its analysis is instructive for both types of claims. There, this Court noted that the following evidence was sufficient to show adultery: (1) the wife, Mrs. Trogdon, began arriving home late at night, and began staying away from the marital home for days at a time until eventually moving out of the home to an apartment; (2) shortly thereafter, Mr. Winfrey, a man who lived in the same apartment complex as Mrs. Trogdon, moved into Mrs. Trogdon's apartment; (3) when asked about the two living together, Mrs. Trogdon noted that they "couldn't see paying rent for two different apartments"; (4) when asked to testify about their living arrangement, Mrs. Trogdon invoked her Fifth Amendment right against self-incrimination; (5) Mrs. Trogdon admitted to her son that she and Mr. Winfrey were "living together"; (6) a private investigator testified that he saw Mrs. Trogdon and Mr. Winfrey stay in their apartment throughout the night and subsequently

witnessed Mr. Winfrey leave the apartment to start Mrs. Trogdon's car before he returned to their shared apartment; and (7) a witness testified that one morning the two exited the apartment and left together. *Id*. at 145–46. Based on this evidence, this Court concluded that the conduct at issue amounted to more than conjecture. *Id*. at 151.

Regarding the opportunity and inclination prongs, this Court also noted that the above evidence amounted to "more than suspicion and conjecture." *Id*. In doing so, the Court explained that, while it would "not presume every male-female living together situation to be amorous," this living arrangement, when combined with the other factors present in *In re Estate of Trogdon*, permit[ted] a "reasonable inference of adultery." *Id*. Specifically, when taken together, the factors listed above supported an inference that Mrs. Trogdon had both an adulterous inclination and the opportunity to satisfy that inclination. *Id*. at 148.

Our Court of Appeals has also addressed the issue of mere conjecture in both alienation of affection and criminal conversation claims. In *Coachman v. Gould*, 122 N.C. App. 443 (1996), the court analyzed the following pre-separation conduct and determined that it did not rise above mere conjecture: (1) a car ride between the plaintiff's wife and the defendant; (2) phone calls between the plaintiff's wife and the defendant; and (3) a statement by the plaintiff's wife while she was in a "medicated stupor" that she had "been with" the defendant, which the court characterized as "ambiguous" and "subject to multiple interpretations." *Id*. at 446.

Regarding the criminal conversation claim, the court noted that, even after viewing the evidence in the light most favorable to the plaintiff, the interactions between the defendant and the plaintiff's wife amounted to no more than "mere conjecture" that the defendant and the plaintiff's wife had engaged in sexual intercourse. *Id.* at 447. To arrive at this conclusion, the court explained that telephone calls and a car ride were not the types of "opportunities" for sexual intercourse required under this Court's precedent in *In re Estate of Trogdon*. *Id.* Accordingly, "in this legal context," the defendant's conduct was "innocuous" and did not "amount to more than mere conjecture." *Id.* (cleaned up).

Regarding the plaintiff's alienation of affection claim, the court concluded that the only evidence that might support a finding that the defendant engaged in wrongful and malicious conduct was phone calls the defendant made to the marital home. *Id.* at 447–48. But the defendant's phone calls could not support this element for two reasons. First, the defendant and the plaintiff's wife "had an ongoing business relationship" and the plaintiff had not met his burden of forecasting evidence that the phone calls were made for non-business purposes. *Id.* at 448. Second, even assuming the calls were of a non-business nature, the plaintiff's allegation that the phone calls were "only partially business" and the rest was just "talk, talk, talk, talk, talk" did not rise to the level of malicious conduct by the defendant designed to alienate the affections of the plaintiff's spouse. *Id.*

In contrast, in *Pharr v. Beck* the Court of Appeals addressed an alienation of

affection claim and determined that the pre-separation conduct at issue rose above mere conjecture. That pre-separation evidence consisted of: (1) meetings between the defendant and the plaintiff's spouse; (2) the defendant holding the plaintiff's husband's hand in front of the plaintiff during the husband's hospitalization; (3) the defendant giving plaintiff's husband several gifts; (4) the defendant giving the plaintiff's husband flirtatious looks; (5) the defendant inviting the plaintiff's husband to her home and then offering to move out of the home when her husband found her there with the plaintiff's husband; (6) the defendant's husband observing the plaintiff's husband and the defendant coming out of the defendant's bedroom after the two consumed alcoholic beverages together; (7) the defendant giving the plaintiff's husband a calling card and instructions on how to call her while he was on vacation with the plaintiff; (8) the defendant allowing the plaintiff's husband to use her post office box; and (9) the defendant asking the plaintiff's husband to help her remodel the house that the two subsequently lived in together. *Id.* at 273–74. Based on this pre-separation conduct, which appears to give rise to more than mere conjecture, the court concluded that post separation sexual intercourse between the defendant and the plaintiff's husband could be used to corroborate the existence of a pre-separation relationship between the parties. *Id.* at 274. Thus, this evidence could be used to substantiate the malice element of the plaintiff's alienation of affection claim. *Id.* at 271–72, 274.

Moreover, in *Rodriguez* the Court of Appeals also concluded that the parties'

pre-separation conduct gave rise to more than mere conjecture that they were engaged in an intimate relationship. 257 N.C. App. at 498–500. There the court addressed both alienation of affection and criminal conversation claims. *Id*. at 495–99. The pre-separation evidence in *Rodriguez* included: (1) 120 phone contacts, which took place over a one-month period, between the defendant and the plaintiff's husband during times when the husband was away from the home; (2) two hotel charges on the plaintiff's husband's credit card; (3) a receipt from a third hotel stay and information from that hotel that the plaintiff's husband was there with a woman; (4) social media posts between the defendant and the plaintiff's husband, using their initials, which the plaintiff interpreted as a code used by the two to communicate. *Id*. at 498.

Because the pre-separation evidence in *Rodriguez* gave rise to more than mere conjecture, the Court of Appeals also reviewed post-separation evidence. *Id*. at 498–99. This evidence, as found by the trial court, consisted of: (1) the plaintiff's husband and the defendant living together; (2) the defendant giving birth to a child, which she named after the plaintiff's husband; (3) the plaintiff's husband having told the plaintiff that he loved the defendant; (4) the plaintiff's husband telling his wife they could not reconcile because the defendant was pregnant; and (5) the defendant admitting at trial that she and the plaintiff's husband had sexual intercourse after he had separated from the plaintiff. *Id*. Accordingly, the Court of Appeals held that the evidence of post-separation conduct in *Rodriguez* corroborated the evidence of pre-

separation conduct and allowed for two "reasonable inference[s]" to be drawn: first, that the defendant was the woman who had accompanied the plaintiff's husband to the hotel on a specified occasion and, second, that the two engaged in sexual intercourse on that occasion, which preceded the plaintiff's separation from her husband. *Id.* at 499. Accordingly, this evidence could be used to meet the malice element of an alienation of affection claim and the sexual intercourse requirement of a criminal conversation claim. *Id.* at 495–96, 499.

In the present case the Court of Appeals determined, and the parties do not dispute, that whether a marriage existed, whether there was love and affection between the spouses, and whether that love and affection were alienated are not at issue here. *Beavers*, 285 N.C. App. at 36–37. Thus, evidence supports the first two elements of Mr. Beavers's alienation of affection claim and the first element of his criminal conversation claim. As for the alienation of affection claim, the issue is whether through "wrongful and malicious acts," Mr. McMican "produced and brought about the loss and alienation" of Mrs. Beavers's "love and affection" for her husband. *McCutchen*, 360 N.C. at 283. These circumstances can be shown through "any intentional conduct that would probably affect the marital relationship," *Rodriguez* 257 N.C. App. at 495 (quoting *Pharr*, 147 N.C. App. at 272), or through sexual intercourse between Mr. McMican and Mrs. Beavers, *id.* at 495–96. Similarly, at issue for the criminal conversation claim is whether sexual intercourse occurred between Mr. McMican and Mrs. Beavers. *Id.* at 495.

It is also apparent that Mrs. Beavers admitted to having sexual relations with someone else before she and Mr. Beavers separated. The only question is whether there is any pre-separation evidence that Mr. McMican was that person. Mr. Beavers's complaint alleges that he first suspected Mr. McMican and his wife were having an affair in January 2016, and that he had "found detailed conversations" between his wife and Mr. McMican, which recounted sexual encounters between the two and included nude photos. Yet, the allegations in Mr. Beavers's complaint are refuted by his deposition testimony, which states that the communications at issue were between Mrs. Beavers and someone named "Bestie." Mr. Beavers also admitted that he did not know the phone number associated with "Bestie" nor did he have knowledge of "Bestie's" identity. In fact, the only information Mr. Beavers had about Mrs. Beavers's alleged paramour, was that the two worked together and that, according to Mrs. Beavers, his name was "Dustin." Moreover, Mr. Beavers did not suspect Mr. McMican was Mrs. Beavers's paramour until the two began openly dating in "the spring of 2017." Based on this information, Mr. Beavers states he "put two and two together."

But even taking this evidence in the light most favorable to Mr. Beavers, as is required under our summary judgment standard, *Cummings*, 379 N.C. at 358, this evidence is insufficient to survive summary judgment because there is no pre-separation evidence that Mr. John McMican is "Bestie," "Dustin," or any other iteration of the man with whom Mrs. Beavers had an affair before she and Mr.

Beavers separated. *See* N.C.G.S. § 1A-1, Rule 56. The contact designated as "Bestie" in Mrs. Beavers's phone, as well as her description of her paramour as "Dustin," is "ambiguous" and "subject to multiple interpretations." *Coachman*, 122 N.C. App. at 446. Accordingly, the evidence does not give rise to more than mere conjecture that Mr. McMican is the man with whom Mrs. Beavers had an affair in January of 2016.

Mr. Beavers notes that, while there is no direct evidence showing that Mr. McMican is "Bestie" or "Dustin" such evidence is not required under *In re Estate of Trogdon*. Although it is true that *In re Estate of Trogdon* acknowledges that "[a]dultery is almost always proved by circumstantial evidence," in that case Mrs. Trogdon's paramour was conclusively identified. 330 N.C. at 148, 151. Thus, while circumstantial evidence may have been used to show that Mrs. Trogdon had an affair, there was no question as to whom Mrs. Trogdon had that affair with. *Id.* at 151. Without evidence of Mrs. Beavers's alleged paramour's identity, Mr. Beavers "cannot produce evidence to support an essential element of his . . . claim." *Lowe*, 305 N.C. at 369. Accordingly, the trial court was correct in granting summary judgment in Mr. McMican's favor.

Additionally, Mr. Beavers argues that Mr. McMican's malicious intent is evidenced by his phone and social media contacts with Mrs. Beavers; however, without evidence that Mr. McMican is "Bestie" or "Dustin," Mr. Beavers has not provided enough evidence to support the malice prong of his alienation of affection claim. Similar to the situation in *Coachman*, Mr. McMican and Mrs. Beavers worked

together at Merck Durham. Thus, to meet the malice standard for an alienation of affection claim, Mr. Beavers needs to show that Mr. McMican's conversations with Mrs. Beavers "were marked by salacious whisperings, plans for clandestine meetings, or any other intonation of improper conduct by [the] defendant." *Coachman*, 122 N.C. App. at 448.

Mr. Beavers cannot meet this standard because he has produced only a wireless phone call record, which does not include any information regarding the content of Mrs. Beavers's and Mr. McMican's phone conversations. He also has produced no information regarding the content of Mr. McMican's and Mrs. Beavers's text messages. Moreover, the Facebook contacts between Mr. McMican and Mrs. Beavers are platonic in nature and consist of a "happy birthday" post from Mrs. Beavers to Mr. McMican, Mr. McMican's having added Mrs. Beavers to a Facebook group, and Mr. McMican "liking" Mrs. Beavers's posts. These Facebook contacts do not rise to the level of those present in *Rodriguez*, which included the parties' purported use of a secret communication code. *See* 257 N.C. App. at 498. Mrs. Beavers "had a right to speak" to Mr. McMican "if she chose to do so." *Coachman*, 122 N.C. App. at 448. Thus, without any verification of Mr. McMican as "Bestie" or "Dustin," the pre-separation conduct in this case does not give rise to more than mere conjecture that Mr. McMican was the person that Mrs. Beavers was seeing romantically in January of 2016.

While Mrs. Beavers admitted to having an adulterous relationship prior to her

separation from Mr. Beavers, there is no pre-separation evidence sufficient to establish that Mr. McMican was the individual involved. Therefore, there is insufficient evidence to support either the sexual intercourse element of Mr. Beavers's criminal conversation claim against Mr. McMican, or an alienation of affection claim predicated on sexual intercourse with Mr. McMican. Moreover, the evidence presented is not sufficient to fulfill the inclination prong of *In re Estate of Trogdon*. While the evidence detailed above reflects communication between Mrs. Beavers and Mr. McMican, it does not reflect an "adulterous disposition[ ] or inclination." *In re Estate of Trogdon*, 330 N.C. at 148. Finally, under the opportunity prong in *In re Estate of Trogdon,* there is no evidence that Mrs. Beavers had the opportunity to commit adultery with Mr. McMican because there is no evidence that she was ever alone with him in circumstances that reasonably could be inferred along with all the other evidence in the case to constitute an opportunity to engage in sexual intercourse. *See In re Estate of Trogdon,* 330 N.C. at 151; *Rodriguez,* 257 N.C. App. at 498-99; *Pharr,* 147 N.C. App. at 273.

Accordingly, because Mr. Beavers cannot show that Mr. McMican was Mrs. Beavers's paramour during the relevant period based on pre-separation evidence, nor can he show the malice prong of an alienation of affection claim or the sexual intercourse element of a criminal conversation claim, the trial court was correct to grant Mr. McMican's motion for summary judgment. *See Lowe*, 305 N.C. at 369 (stating that summary judgment is appropriate when the moving party shows "that

the opposing party cannot produce evidence to support an essential element of his or her claim."). Thus, we reverse the decision of the Court of Appeals and instruct that court to reinstate the trial court's order granting summary judgment in favor of defendant.

REVERSED.